## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

MICHELLE SEMELBAUER, PAULETTE BOSCH, DENISE VOS, CRISA BROWN, LATRECE BAKER, TAMMY SPEERS, LONDORA KITCHENS, STASHIA COLLINS, ANDREA DORN, JUDY PAULEY, and DELILAH WICKLIFFE, individually and on behalf of all similarly situated persons,

       Plaintiffs,

vs.

MUSKEGON COUNTY, a municipal corporation; DEAN ROESLER, in his official capacity as Muskegon County Sheriff; LT. MARK BURNS, in his official capacity as Jail Administrator; CORRECTIONAL OFFICERS IVAN MORRIS, GRIEVES, DEYOUNG, and DAVID GUTOWSKI, in their individual capacities; and UNKNOWN CORRECTIONAL OFFICERS, in their individual capacities,

       Defendants.

_____/

**CASE NO: 1:14-cv-01245-JTN**

**HON. JANET T. NEFF**

**CLASS ACTION**

AMERICAN CIVIL LIBERTIES UNION
  FUND OF MICHIGAN
Miriam J. Aukerman (P63165)
Marc S. Allen (NY 5230008)
1514 Wealthy Street SE, Suite 242
Grand Rapids, MI 49506
(616) 301-0930
maukerman@aclumich.org

Daniel S. Korobkin (P72842)
Michael J. Steinberg (P43085)
Kary L. Moss (P49759)
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6800
dkorobkin@aclumich.org

PITT, McGEHEE, PALMER& RIVERS, P.C.
Michael L. Pitt (P24429)
Beth M. Rivers (P33614)
Kevin M. Carlson (P67704)
Andrea J. Johnson (P74596)
Cooperating Attorneys, American Civil
  Liberties Union Fund of Michigan
117 West Fourth Street, Suite 200
Royal Oak, MI 48067
(248) 398-9800
mpitt@pittlawpc.com
brivers@pittlawpc.com
kcarlson@pittlawpc.com
ajohnson@pittlawpc.com

_____/

## FIRST AMENDED COMPLAINT

## INTRODUCTION

1.      This is a class action lawsuit challenging the unconstitutional and inhumane conditions of confinement at the Muskegon County Jail ("MCJ").

2.      The named plaintiffs are eleven women who are current and former inmates of MCJ.  In this complaint they challenge severe overcrowding and other abysmal conditions that affect all MCJ inmates, as well as policies, practices and conditions at MCJ that uniquely harm women.

3.      MCJ is severely overcrowded.  Some plaintiffs were held for days with other women in a tiny holding cell without a shower or bed, and without even sufficient space for them to lie down.

4.      In some cases, plaintiffs were confined in this tiny space with other women who were experiencing the symptoms of drug or alcohol withdrawal, including vomiting.

5.      Other appalling conditions at MCJ include vermin, insects, mold, overflowing and constantly running toilets, broken sinks, scalding water, unchecked contagious diseases, and falling ceiling tiles.

6.      In order to shower, some plaintiffs must stand in pools of water that fail to drain after other inmates, who have contagious infections or who are menstruating, have taken their showers.

7.      Male MCJ guards routinely and regularly view women inmates while they are naked or partially naked, including while they are showering, changing clothes, or using the toilet.

8.      Defendants fail to provide adequate feminine hygiene products to women detained at MCJ, causing them to bleed through their clothes.

9.      Defendants also confiscated some women's brassieres and fail to provide replacements.

10.     With some limited exceptions, plaintiffs, like other men and women detained at MCJ, are essentially on lockdown 24 hours a day, seven days a week.

11.     Female MCJ inmates are rarely or never permitted out-of-cell exercise.

12.     Women detained at MCJ suffer from severe verbal abuse by guards, and are routinely called "bitches" and "whores" by defendant correctional officers.

13.     African-American female inmates are called "niggers" by defendant correctional officers and are told they are "like animals in a zoo."

14.     Defendants fail to respond to inmates' grievances about the severe conditions.

15.     Women inmates are routinely told that grievances are ripped up and sometimes see guards throw them away.

16.     In part because of the absence of a functioning grievance system, defendants utterly fail to respond to inmates' urgent needs.

17.     One of the plaintiffs, Michelle Semelbauer, was even forced to endure these conditions for several weeks after she should have been released from MCJ.

18.     Ms. Semelbauer was incarcerated in MCJ on October 9, 2012, pursuant to a "pay or stay" order issued by a state court judge in a criminal case.  A "pay or stay" order is a type of disposition that requires a defendant to either pay a fine or go to jail.

19.     Ms. Semelbauer's fines were paid soon after she arrived at MCJ, but she remained in custody for 28 more days.

20.     Ms. Semelbauer continually notified jail staff, both verbally and in writing, that she should have been released because her fines had been paid.

2

21.     Ms. Semelbauer's friends repeatedly contacted the jail by phone to find out why she had not been released.

22.     Despite these warnings, Ms. Semelbauer remained incarcerated at MCJ until November 7, 2012.

23.     Plaintiffs now bring this action to vindicate their rights, and the rights of those similarly situated, under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.

**SUMMARY OF CLASS ACTION STRUCTURE AND INDIVIDUAL CLAIMS**

24.     Plaintiffs seek to represent four overlapping classes as follows:

    a.      The first class (the "Female Damages Class") consists of former female inmates of MCJ seeking damages for harms specific to female inmates. This class seeks damages against the municipal defendants[1] under Count I of this Complaint (violation of privacy and bodily integrity); Count II (denial of exercise); and Count III (denial of access to feminine hygiene products and adequate clothing).

    b.      The second class (the "Overcrowding Damages Class") consists of former male and female inmates of MCJ seeking damages for overcrowding and other abysmal conditions of confinement that affect inmates of both genders at MCJ.  This class seeks damages against the municipal defendants under Count IV of this Complaint (overcrowding and other abysmal conditions).

---

[1] The "municipal defendants" are Muskegon County and the defendants sued in their official capacities.

c. The third class (the "Female Injunctive Class") consists of current and future female inmates of MCJ seeking declaratory and injunctive relief from ongoing harms specific to female inmates. This class seeks declaratory and injunctive relief against the municipal defendants under Count I of this Complaint (violation of privacy and bodily integrity); Count II (denial of exercise); and Count III (denial of access to feminine hygiene products and adequate clothing).

d. The fourth class (the "Overcrowding Injunctive Class") consists of current and future male and female inmates of MCJ seeking declaratory and injunctive relief from ongoing overcrowding and other abysmal conditions that affect inmates of both genders at MCJ. This class seeks declaratory and injunctive relief against the municipal defendants under Count IV of this Complaint (overcrowding and other abysmal conditions).

25. The following plaintiffs seek to serve as class representatives:

a. The Female Damages Class and the Overcrowding Damages Class (together, the "Damages Classes") will be represented by plaintiffs Michelle Semelbauer, Paulette Bosch, Denise Vos, Crisa Brown, Latrece Baker, Tammy Speers, and Londora Kitchens.

b. The Female Injunctive Class and the Overcrowding Injunctive Class (together, the "Injunctive Classes") will be represented by plaintiffs Stashia Collins, Andrea Dorn, Judy Pauley, and Delilah Wickliffe.

26. In addition to serving as class representatives, plaintiffs also seek damages individually (i.e., on their own behalf) as follows:

a.  All plaintiffs seek damages against the municipal defendants and unknown correctional officers under Counts I through IV.

b.  Plaintiff Michelle Semelbauer seeks damages against the municipal defendants, defendants Morris and Gutowski, and unknown correctional officers under Count V.

c.  Plaintiff Denise Vos seeks damages against defendant Gutowski under Count I.

d.  Plaintiff Londora Kitchens seeks damages against defendant Grieves under Count III.

e.  Plaintiff Stashia Collins seeks damages against defendant DeYoung under Count I and against defendant Morris under Count III.

## JURISDICTION AND VENUE

27.  This Court has jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1343 because federal questions are presented in this action under the Fourth, Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

28.  Venue is proper under 28 U.S.C. §§ 1391(b)(1) and (2) because the defendants reside in this district and the events and omissions giving rise to the claims occurred and/or will occur in this district.

## PARTIES

29.  Plaintiff Michelle Semelbauer is a former MCJ inmate. She was incarcerated in MCJ from October 9, 2012 until November 7, 2012.

30.     Plaintiff Paulette Bosch is a former MCJ inmate.  She was incarcerated in MCJ on from approximately December 2012 until April 2013.  At the time she was incarcerated, her name was Paulette Gauthier.

31.     Plaintiff Denise Vos is a former MCJ inmate.  She was incarcerated in MCJ from approximately June 2011 until February 2012.

32.     Plaintiff Crisa Brown is a former MCJ inmate.  She was incarcerated in MCJ from approximately February 2014 until April 2014.

33.     Plaintiff Latrece Baker is a former MCJ inmate.  She was incarcerated in MCJ on several occasions including from approximately March 2014 until April 2014 and again in November 2014.

34.     Plaintiff Tammy Speers is a former MCJ inmate.  She was incarcerated in MCJ from approximately March 2014 until August 2014.

35.     Plaintiff Londora Kitchens is a former MCJ inmate.  She was incarcerated in MCJ from approximately January 2014 until September 2014.

36.     Plaintiff Stashia Collins was an MCJ inmate at the time this lawsuit and plaintiffs' motion for class certification were filed.  She was incarcerated in MCJ from August 2014 until January 2015.

37.     Plaintiff Andrea Dorn is a current MCJ inmate.  She has been incarcerated in MCJ since November 2014.

38.     Plaintiff Judy Pauley is a current MCJ inmate.  She has been incarcerated in MCJ since July 2014.

39.     Plaintiff Delilah Wickliffe is a current MCJ inmate.  She has been incarcerated in MCJ since December 2014.

40.     All plaintiffs reside in the Western District of Michigan.

41.     Defendant Muskegon County is a municipal corporation organized under the laws of the State of Michigan.  Muskegon County operates MCJ.  Muskegon County and MCJ are located in the Western District of Michigan.

42.     Defendant Dean Roesler is sued in his official capacity as Muskegon County Sheriff.  He is the chief law enforcement officer for Muskegon County.

43.     Defendant Mark Burns is sued in his official capacity as Jail Administrator for MCJ.

44.     Defendant Ivan Morris is a correctional officer at MCJ.  Upon information and belief, he resides in the Western District of Michigan.  He is being sued in his individual capacity.

45.     Defendant David Gutowski was at all times relevant to this Complaint a correctional officer at MCJ.  Upon information and belief, he resides in the Western District of Michigan.  He is being sued in his individual capacity.

46.     Defendant DeYoung is a correctional officer at MCJ.  Upon information and belief, he resides in the Western District of Michigan.  He is being sued in his individual capacity.

47.     Defendant Grieves is a correctional officer at MCJ.  Upon information and belief, she resides in the Western District of Michigan.  She is being sued in her individual capacity.

48.     Defendants unknown correctional officers are correctional officers who currently work at MCJ or, at any time relevant to this Complaint, previously worked at MCJ, and whose identities are not yet known.  They are sued in their individual capacities.

## FACTUAL ALLEGATIONS

**A.    General Allegations**

49.    MCJ holds male and female inmates, including both pre-trial detainees and sentenced individuals.

50.    MCJ was built in 1959, with some additions since that time.

51.    MCJ is designed to house 370 inmates.

52.    MCJ routinely houses well over 400 inmates.

53.    Between January 2011 and April 2014 there were between 41 and 121 women held at MCJ on any given day.

54.    Women inmates are generally held either in 12-person cells along the "cat walk" (a corridor used by staff and inmate trustees), in other multi-person cells (e.g., 6 person cells), in 2-person cells attached to a "day room," or in bunks in the common areas of the "day room."

55.    When inmates first arrive at MCJ they are processed through the booking area and "holding tanks," which are designed to hold inmates for brief periods until they are transferred to their cells, or while they are being transferred to court or other outside locations.

**B.    Cross-Gender Viewing**

56.    Genitals, buttocks, and, for women, breasts are especially private parts of the human body.

57.    Involuntary exposure of these private body parts to members of the opposite sex is uniquely demeaning and humiliating.

58.    The act of using the toilet and, for women, of attending to the sanitary needs related to menstrual periods, are especially private acts.

59.     The toilets and showers used by plaintiffs and other female inmates are not shielded by privacy walls.

60.     As a result, male guards and male inmate trustees repeatedly and routinely observe plaintiffs, and other female inmates, while they are using the toilet, including times when plaintiffs have had their menstrual period.

61.     Furthermore, male guards repeatedly and routinely observe plaintiffs, and other female inmates, while they are showering or changing clothes, and are naked or partially naked.

62.     Plaintiffs and other women inmates are subject to cross-gender viewing beginning when they first enter the jail and are held in the holding tank.

63.     All plaintiffs and other women inmates have been held in the holding tank upon arrival at the jail.  Male guards, as well as all inmates walking past the holding tank, can see the holding tank's toilet and observe inmates while they use the toilet.

64.     After leaving the holding tank, plaintiffs and other women inmates remain subject to cross-gender viewing, regardless of whether they are held in the 12-person cells near the cat walk, other multi-person cells, the 2-person cells around the day room, or the day room itself, as all these areas are constructed so that women inmates using the toilet, showering, or changing clothes can be viewed by male guards.

65.     For the 12-person and 6-person cells, male guards and male inmate trustees have a clear and unobstructed view of the toilets and showers.  There is also no location in these cells where plaintiffs and other women inmates can change clothes without being seen by male guards and male inmate trustees from the cat walk.

66.     For women held in 2-person cells near the day room, male guards and male inmates can see women toileting, showering, and changing clothes.  Male guards have a clear

and unobstructed view of the showers in the day room, and a clear and unobstructed view from the day room of the toilets in the 2-person cells surrounding the day room.

67.     Women who sleep on bunks in the common area of the day room also have no privacy when changing or getting dressed after bathing and are routinely viewed by male guards while naked.

68.     During their incarceration, plaintiffs Michelle Semelbauer, Paulette Bosch, Denise Vos, Latrece Baker, Judy Pauley and other women inmates had to wear one-piece jump suits.

69.     Because they were required to wear one-piece jump suits, in order to use the toilet, plaintiffs had to disrobe and expose their bodies.[2]

70.     MCJ confiscates and does not replace the bras of some women inmates.

71.     Ms. Bosch and other female inmates whose bras were confiscated by MCJ officers were forced to expose their naked breasts when lowering their jumpsuits to use the toilet.

72.     Male guards repeatedly and routinely enter cells and day room facilities without knocking or announcing themselves while female inmates are using the toilet, disrobing, or using the showers.

73.     For example, while Ms. Vos was using the toilet, defendant Gutowski walked in and began talking with other inmates and passing out medication.

74.     At the time of this encounter, Ms. Vos, who had been wearing a one-piece jumpsuit, was completely naked.

---

[2] Recently, the MCJ began providing inmates with two-piece suits.

75.     Plaintiffs and other women inmates have attempted to protect their bodily privacy by using their bodies, trash bags, towels or bed linens to prevent male guards and inmates from seeing women who are changing clothes, using the toilet or using the shower.

76.     Plaintiffs and other women have attempted to protect their privacy by temporarily covering the windows on cell doors with plastic bags or other items while using the toilet.

77.     Women inmates are either disciplined or threatened with discipline when they attempt to protect their own privacy and bodily integrity in this manner.

78.     For example, Ms. Collins attempted to gain privacy while using the toilet by hanging a sheet over the window into her cell.  When she did this, guards including defendant DeYoung tore down the sheet and reprimanded her.

79.     Similarly, Ms. Dorn tries to protect her privacy when changing or using the toilet by placing sheets or paper on her cell window, but guards immediately rip them down.

80.     Ms. Pauley likewise tries to put up magazine pages over parts of her cell window while using the toilet or changing.  However guards tear these papers down or barge into her cell unannounced.

81.     Ms. Vos hung up sheets to protect her privacy while showering and using the toilet, but defendants David Gutowski and unknown correctional officers took them down.

82.     Unknown correctional officers confiscated all bedding when Ms. Vos or other inmates sought to protect their privacy by hanging sheets.

83.     When Ms. Vos was held in a cell off the dayroom, she tried to temporarily put up toilet paper on her cell door window in order to protect her privacy while using the toilet, but defendants David Gutowski and unknown correctional officers tore it down.

84.     MCJ staff repeatedly tell women inmates that they have no privacy rights once they enter jail and that if they wanted privacy rights, they should not have gotten arrested.

85.     MCJ does not have any penological justification for allowing male guards and male inmate trustees to routinely observe plaintiffs and other female inmates while they use the toilet, shower, or change clothes.

86.     Defendants' practice of routinely allowing such cross-gender viewing has continued unabated since the initial filing of this lawsuit.  Ms. Dorn, Ms. Pauley, and Ms. Wickliffe, all of whom are currently incarcerated at MCJ, are regularly observed by male guards while they change, shower, or use the toilet.

**C.     Denial of Exercise Opportunities**

87.     Plaintiffs and other women inmates at MCJ rarely if ever receive out-of-cell exercise opportunities.  They are essentially locked in their cells 24 hours per day, 7 days per week.

88.     Upon information and belief, male inmates at MCJ receive out-of-cell exercise opportunities more regularly.

89.     MCJ has an indoor gym with exercise equipment.

90.     Plaintiffs and other women inmates could be and could have been, but are not and were not, brought to that gym for regular out-of-cell exercise.  Until after this lawsuit was filed, women were rarely if ever allowed to access the exercise equipment in the gym.

91.     MCJ's "Rules and Regulations for Inmates" contains a list of "privileges," which list exercise as a "privilege."

92.     Plaintiffs and other female inmates held in the 2-person cells adjoining the day room are routinely locked down in their tiny cells and cannot leave those cells for extended periods of time.

93.     During the approximately five-month period that Ms. Bosch was incarcerated at MCJ, she was allowed to go to the gym only twice.

94.     During Ms. Vos's 7 ½-month-long incarceration, she was allowed to go to the gym on only two brief occasions and only because her cell was being searched.

95.     During the approximately 30 days Ms. Semelbauer was incarcerated, she was never allowed access to the gym.

96.     During the approximately three months Ms. Brown was incarcerated, she was allowed to go to the gym only once for 30 minutes while corrections officers searched her cell.

97.     During Ms. Kitchens' approximately eight-month incarceration, she asked to use the gym repeatedly and was never allowed access.  In order to exercise while at MCJ, Ms. Kitchens tried to walk laps around her cell because she was denied access to the gym or any outdoor recreational area.

98.     During the approximately five months that Ms. Brown was incarcerated, she was allowed to go to the gym only three times.

99.     Ms. Baker was never allowed access to the gym during either her March/April 2014 incarceration or her November 2014 incarceration.

100.    From the beginning of Ms. Collins's incarceration in August 2014 until this lawsuit was filed, she was given access to the gym only once, and during that visit the exercise equipment kept in the gym was locked away.

101.    Ms. Dorn has been to the gym only twice in her three-month incarceration.

13

102.    Ms. Pauley has been to the gym only three times in her eight-month incarceration.

103.    Ms. Wickliffe has been to the gym only twice during her two month incarceration.

104.    Plaintiffs have suffered physical injuries including muscle atrophy and weight gain due to lack of out-of-cell exercise.

105.    For example, Ms. Collins gained weight and lost muscle mass during her incarceration, and at the time this lawsuit was filed she feared further deterioration of her health due to lack of out-of-cell exercise.

106.    Ms. Dorn, who recently gave birth, fears that the lack of exercise is taking a toll on her on her health.

107.    Ms. Pauley is recovering from a severe injury and has nine screws in her left ankle.  She needs regular exercise to keep her ankle from getting stiff and painful, and she fears her lack of exercise will impair her recovery and exacerbate her physical injury.

**D.    Denial of Feminine Hygiene Products, Toilet Paper, and Adequate Clothing**

108.    Plaintiffs and other women inmates at MCJ are not provided with adequate feminine hygiene products or toilet paper.

109.    Female inmates who menstruate do not receive sanitary napkins in a timely fashion and in some instances are not provided with sanitary napkins at all.

110.    Plaintiffs and other female inmates who menstruate and are denied pads bleed into their clothing and are often not provided with clean clothing until the next laundry day, which only occurs once per week.

111.    Consequently, women may have to wear bloody clothing for as long as a week before a clean jumpsuit is provided.

112.     When Ms. Vos got her menstrual period while incarcerated at MCJ, she pleaded again and again for several hours before she was finally provided with sanitary napkins.

113.     When officers finally provided feminine hygiene products to Ms. Vos, they did not provide enough.

114.     When Ms. Vos was held in the day room, unknown correctional officers provided only one pack of 12 pads for as many as 30 women, and told them to share.

115.     Ms. Kitchens asked MCJ staff for pads on or about July 13, 2014.  She did not receive any for hours, and was told by defendant Grieves that she was "shit out of luck" and "don't bleed on the floor."

116.     Ms. Speers bled into her clothes when she had her period.  Although she begged for sanitary products, Ms. Speers was not given pads for approximately two days.

117.     Ms. Brown requested sanitary products during her period, but was not given any for approximately eight hours.

118.     Ms. Collins requested sanitary products from defendant Morris and did not receive any for over ten hours.  By the time she finally received sanitary products she had bled into her clothing.  She was not able to obtain fresh clothing for several hours.

119.     On or about December 27, 2014, Ms. Wickliffe began menstruating and asked guards for pads.  Guards ignored her requests for almost a day.  Consequently, Ms. Wickliffe bled into her uniform.  When she requested a new uniform, guards told her that "it was her own fault," and did not provide a replacement uniform for another 24 hours.

120.     Ms. Dorn and Ms. Baker have both been forced to wait hours in order to obtain toilet paper.

121.  Women who enter MCJ while wearing a bra that is not approved, such as a colored bra, have their bras confiscated.

122.  When the MCJ confiscates a bra, MCJ does not provide a replacement bra, forcing women to go without a bra.

123.  When Ms. Bosch was taken to jail, unknown correctional officers confiscated her red sports bra and her boxer underwear.

124.  MCJ did not provide Ms. Bosch with a replacement bra, and she did not get a bra until a family member put money in her commissary account and she was able to buy one.

125.  MCJ does not provide underwear.

126.  Ms. Speers wore the same single pair of underwear for most of her time at MCJ.

127.  When Ms. Speers bled into that underwear and washed it, she had go without underwear while it dried.

128.  Women inmates are given inadequate clean clothing, laundry and linens.

129.  During wash day women are forced to wrap themselves in towels or sheets because they lack adequate clothing.

**E.      Extended Stays in the Overcrowded Holding Tank**

130.  Upon information and belief, the holding tanks at MCJ are the size of a large closet.  However, plaintiffs and other women have been held in these small cells with as many as 18 other women at one time.

131.  At MCJ, women inmates are often held in a holding tank for days at a time.

132.  There are no beds in the holding tank.  Women sleep on concrete benches or on the concrete floor without mats.  When the holding tanks are overcrowded, there is not sufficient space for inmates to lie down.

133.     The holding tanks in MCJ do not have showers.  Women held in the holding tank do not have a way to clean themselves, even when they are there for several days and are ill or menstruating.

134.     The holding tanks in MCJ have toilets that can be viewed by male guards.

135.     Plaintiff Tammy Speers was held in the MCJ holding tank for approximately seven days.  Ms. Speers experienced opiate withdrawal while in the holding tank.  During these seven days, she was vomiting and had diarrhea.  Although Ms. Speers was covered in vomit and feces, she was not allowed to shower.

136.     Upon information and belief, MCJ housed up to 18 women in the holding tank while Ms. Speers was held there.  During this time, there was insufficient space in the holding tank for the inmates to sit down.

137.     During times when there were fewer inmates in the holding tank, Ms. Speers found a space on the floor where she could lie down.  However, Ms. Speers was not given a mat or blanket, and she was forced to lie next to a leaking toilet with ants crawling over her and up her nose.

138.     Ms. Bosch was held in the MCJ holding tank for approximately seven days with up to 15 other women.

139.     Ms. Brown was placed in the holding tank for approximately two days.

140.     Ms. Semelbauer was in the holding tank for approximately three to four days with many other women.

141.     While in the holding tank Ms. Semelbauer was punched in the face by another inmate and woke up to another inmate straddling her face—exposing her genitals to Ms.

Semelbauer. Ms. Semelbauer requested a complaint form so she could report this assault, but she was never given a form.

142.     Ms. Collins was in the holding tank for approximately four or five days with as many as 18 other women.

143.     Ms. Pauley was placed in the holding tank for approximately three days with as many as seventeen other women.

144.     In November 2014, Ms. Baker was in the holding tank for approximately three days. Her hip still hurts from sleeping on the cement floor without a mat. During both her March and November 2014 incarcerations, the sink in the holding tank was broken, meaning nobody, including her, could wash their hands for sanitation or drink water except when provided with meals.

**F.     Other Abysmal Conditions of Confinement**

145.     The walls, floors, windows, showers, and shower curtains inside the MCJ are covered in mold.

146.     Due to unsanitary conditions, the MCJ is infested with sewer bugs, water bugs, silver fish, spiders, ants, and other insects, as well as mice.

147.     Ceiling tiles inside the MCJ are falling down.

148.     Toilets routinely overflow or back up, spilling human waste into the cells. Inmates are regularly exposed to human feces, urine, blood, and vomit. In some cells there is standing liquid on the floors that contains human waste.

149.     In the cells off the day room, when an inmate flushes the toilet, waste or menstrual blood comes back up into the toilet of the adjoining cell.

150.     In some cases inmates work together in an attempt to cope with the plumbing problems: they count to three in their adjoining cells, and then flush simultaneously in an effort to make the waste from both cells go down the pipes.

151.     In order to shower, some inmates, including plaintiffs, must stand in pools of water that failed to drain after other inmates, who have infections or who are menstruating, take their showers.

152.     During Ms. Bosch's incarceration, the shower in her cell stopped working, and was not repaired for three days, despite repeated written complaints by the twelve women in that cell who were unable to shower during that time.

153.     Some showers have only burning hot water.  Plaintiffs and other female inmates collect the scalding water in rubber or plastic totes, and wait for it to cool before using it to bathe.  The guards who see this mock the women as taking "bird baths."

154.     On one occasion, the tote Ms. Bosch was using to collect hot water tore open, causing hot water to burn her skin.  Jail guards refused to take Ms. Bosch to the medical unit after this incident.

155.     Ms. Speers was burned on her scalp by scalding water from the shower.  MCJ medical staff prescribed her medicinal shampoo and suggested that she move to a cell with a working shower.

156.     Staff at MCJ have known about and acknowledged these conditions for years.

157.     The Michigan Department of Corrections has inspected the MCJ, and has called for immediate improvements in conditions.

158.     The most recent MDOC inspection report available to plaintiffs' counsel noted, among other things, that leaking toilets created a "serious potential health hazard"; that flushing

toilets cause sewage backups into toilets of other cells; that shower water is "extremely hot" in many cells, creating "a potential hazard to the user"; that water is leaking onto cell floors; that shower curtains are soiled and "contain a black substance suspected to be mold/mildew"; that air vents contain a black substance suspected to be mold/mildew; and that there were bugs in the sleeping areas.

## G.    Severe Overcrowding

159.    The MCJ is routinely severely overcrowded, and constantly exceeds its rated design capacity to house 370 inmates.

160.    The Michigan County Jail Overcrowding State of Emergency Act ("JOA"), M.C.L. § 801.51 *et seq.*, provides standards on jail overcrowding that can inform the court in assessing plaintiffs' claim that the level of overcrowding at MCJ is unconstitutional.

161.    The JOA directs that if the general prisoner population of a county jail exceeds 100% of the rated design capacity of the jail for seven consecutive days, the county sheriff must declare a jail overcrowding state of emergency. M.C.L. §§ 801.52, 801.53.

162.    The JOA provides a progressive series of steps designed to eliminate the overcrowding emergency by reducing the jail population to an acceptable level, defined in M.C.L. § 801.56(1) as the higher of (a) 90% of capacity or (b) at least ten empty beds for facilities of less than 500 beds. For the MJC, the acceptable level is 360 inmates (ten empty beds).

163.    For the first fourteen days of an overcrowding emergency, local officials, including the sheriff, should seek to reduce the prisoner population by existing legal means, such as pretrial diversion, reduction in bonds, use of community mental health resources, and use of community programs. M.C.L. § 801.55.

164.    Where steps taken under M.C.L. § 801.55 fail to reduce the jail population sufficiently to eliminate jail overcrowding within 14 days, then the JOA directs that the sheriff supply the chief circuit judge with information about each prisoner.  The chief judge is directed to classify prisoners into those whose release would present a high risk to public safety and those whose release would not present such a risk.  The sheriff must then reduce the sentences of low-risk prisoners by an equal percentage, set by the chief circuit judge, until the overcrowding is alleviated.  The circuit judge may also modify bonds of pre-trial detainees.  M.C.L. § 801.56(2)-(4).

165.    If the steps taken under M.C.L. §§ 801.55 and 801.56 fail to reduce the jail population sufficiently to eliminate jail overcrowding within 28 days, then under § 801.57, the sheriff must equally reduce prisoner sentences in order to reduce the jail population to an acceptable level, as defined in M.C.L. § 801.56(1).

166.    If the steps taken under M.C.L. §§ 801.55, 801.56 and 801.57 fail to reduce the jail population sufficiently to eliminate jail overcrowding within 42 days, then the sheriff must defer acceptance for incarceration of persons committed to the jail (with exceptions for certain persons convicted or charged with certain specified offenses) until the overcrowding state of emergency is ended.  M.C.L. § 801.58.

167.    According to an August 22, 2012 written statement by defendants Roesler and/or Burns, the MCJ has been in a "persistent state of overcrowding since September 2008."

168.    Plaintiffs' counsel and their assistants have reviewed inmate count data provided by MCJ from January 2011 to April 2014.

169.    This data shows that the MCJ virtually always exceeds its rated design capacity of 370 inmates, and virtually never is below the level of 360 inmates which is acceptable under JOA.[3]

170.    Specifically, the data shows that:

     a.    There were only 9 days between January 1, 2014 and April 16, 2014, where the MJC was below the rated design capacity of 370 inmates. There were only 2 days where the MCJ was below the 360-inmate acceptable level.

     b.    There was only one day in 2013 where the MCJ was below the rated design capacity.  (This excludes the period from 8/29/2013-10/31/2013, for which the MCJ did not provide count data.)

     c.    There was not a single day in 2012 where the MCJ was below the rated design capacity.

     d.    There were only 5 days in 2011 where the MCJ was below the rated design capacity. On none of those 5 days was the count below the 360-inmate acceptable level.

171.    This data also shows that MCJ daily counts are routinely over 400 inmates.

172.    Specifically, the data shows that:

     a.    There were 65 days between January 1, 2014 and April 16, 2014, where the MCJ held over 400 inmates. On one date in February, 484 inmates – 114 inmates over the rated design capacity – were housed in the jail.

     b.    In 2013, there were 228 days where the MCJ held over 400 inmates.

---

[3] Plaintiffs rely on the data as provided by MJC pursuant to a Freedom of Information Act request.  However, this data appears to contain many errors, and plaintiffs therefore believe the data may actually understate the extent of the problem.

  c.  In 2012, there were 309 days where the MCJ held over 400 inmates.

  d.  In 2011, there were 252 days where the MCJ held over 400 inmates.

  173. Over the past five years, Defendant Roessler has repeatedly declared an overcrowding emergency under the JOA.

  174. Defendant Roessler has released some inmates under the provisions of the JOA.

  175. However, the steps taken by defendants have failed to lower the MCJ population to acceptable levels under M.C.L. § 801.56(1).

  176. Upon information and belief, despite the fact that the MCJ has consistently failed to  meet the standards set out in M.C.L. § 801.56(1), defendants have not continued to employ overcrowding reduction measures mandated by the JOA.

  177. Due to overcrowding at the MCJ, defendants routinely require inmates to sleep:

  a.  on cots in the common area of the day room;

  b.  on the floors of cells that are designed with beds for 12 inmates; and

  c.  in the holding tank for several days at a time with so many other inmates that there is limited space to sit or lie down.

  178. Due to the severe overcrowding, coupled with inadequate staffing, the MCJ is unable to maintain basic sanitation, provide basic medical care, or ensure the health and safety of inmates.

## H.  Non-Functional Complaint System

  179. In order to seek medical attention, request assistance with basic needs (e.g., obtain pads or toilet paper), or raise other issues, MCJ inmates are ostensibly allowed to submit "kites," or written requests.

180.    The MCJ ostensibly has a grievance policy, which provides that inmates may bring problems to the attention of MCJ staff through a written complaint.

181.    The MCJ's "Rules and Regulations for Inmates" contains a list of "privileges," which lists as a "privilege" the ability "to file grievances."

182.    In practice, defendants routinely ignore both kites and grievances.

183.    MCJ staff, including defendants Morris and Gutowski, repeatedly and routinely tell inmates that their grievances will simply be discarded, and sometimes even rip up or throw away the grievances in front of inmates.

184.    Ms. Bosch wrote approximately 20 grievances while at the MCJ, which concerned the jail's failure to treat a MRSA infection in her C-section, as well as access to jail programming.  Ms. Bosch never received any response to her grievances.  In desperation, Ms. Bosch began mailing her grievances through the U.S. Postal System to the jail, in the hopes that they would reach senior jail staff, but she did not receive a response.

185.    Ms. Vos attempted to write kites requesting medical care for an abscessed tooth. The MCJ never allowed Ms. Vos to see a doctor for her tooth.  After approximately three months, Ms. Vos was given Tylenol for pain.

186.    Defendant Morris told Ms. Vos that when inmates write grievances, the grievances are given to the officer in question, who then puts them right into the garbage.

187.    Ms. Brown wrote approximately eight grievances while incarcerated at MCJ. These grievances concerned issued such as the showers being so hot that she was burned, and the lack of feminine hygiene products.  MCJ staff did not respond to any of them.

188.    On one occasion, Ms. Brown was put in a restrictive and revealing anti-suicide smock in the holding tank for several hours in retaliation for writing a grievance.

189.   Ms. Speers wrote multiple grievances on issues ranging from her excessive detention in the holding cell, to the overall abysmal conditions of the facility, to threats by other inmates, to mistreatment by guards, but she received only one response.

190.   The one grievance for which Ms. Speers received a response was regarding guard misconduct.

191.   The guard against whom Ms. Speers had filed the grievance personally brought Ms. Speers a copy of the supervisor's response, which stated that Ms. Speers had submitted many grievances and her grievances were without merit.

192.   Ms. Speers also wrote multiple kites, without response.

193.   Ms. Speers tried writing directly to the sergeant and lieutenant, but received no response.

194.   Ms. Speers was also put in an anti-suicide suit in retaliation for filing grievances. In addition, Ms. Speers was mocked by guards and told that her life would be much easier if she did not complain.

195.   Ms. Collins filed grievances regarding mistreatment by guards, lack of toiletries, lack of cleaning supplies, cross-gender viewing, and other issues to no avail. Guards ignored both her verbal requests and written kites.

196.   Ms. Wickliffe has filed approximately five grievances.  She has not received any responses.  Furthermore, Ms. Wickliffe has been denied grievance forms when she requests them.

197.   Ms. Pauley similarly filed grievances, but received no response.

## I.       The Unlawful Incarceration of Michelle Semelbauer

198.    Michelle Semelbauer was sentenced to MCJ on a "pay or stay" sentence on September 10, 2012.

199.    The "pay or stay" sentence required Ms. Semelbauer to serve 54 days in jail unless she paid fines, costs, and other court-ordered assessments related to a conviction for driving on a suspended license.

200.    On September 12, 2012, Ms. Semelbauer's outstanding fees were paid at the clerk's office.  That same day, Ms. Semelbauer told various staff members at the MCJ that her fees had been paid and that she should be released.

201.    Ms. Semelbauer was not released that day.

202.    Ms. Semelbauer continued to tell jail staff, both orally and through the jail's written "kite" system, that her fees had been paid in full and that her sentence was completed.

203.    MCJ staff responded to Ms. Semelbauer's pleas with indifference or outright scorn.

204.    Some corrections officers told Ms. Semelbauer that she was lying, while others laughed in her face.

205.    In one instance, Ms. Semelbauer was removed from her cell by defendants Morris and Gutowski, who asked her to explain why she kept complaining that she should be released. Ms. Semelbauer told them that she was serving a pay-or-stay sentence, and that her balance had been paid in full.  Upon information and belief, Defendants Morris and Gutowski failed to take any action in response.

206.     Ms. Semelbauer's incarceration continued after she informed Defendants Morris and Gutowski of her unlawful incarceration.  She continued to inform jail staff that she was being unlawfully held.

207.     During Ms. Semelbauer's incarceration, her friend called the jail, explained that her court-ordered fees had been paid, and asked why she had not been released.  Again, defendants took no action to address Ms. Semelbauer's situation.

208.     During Ms. Semelbauer's unlawful incarceration she was subjected to cross-gender viewing, spent four consecutive days in the holding tank, and was never given access to the jail's gym.  She was also exposed to mold, broken plumbing, and the various unsanitary and abysmal conditions inside the MCJ identified in this Complaint.

209.     Furthermore, during her unlawful incarceration, Ms. Semelbauer was assaulted by another inmate, who punched Ms. Semelbauer in the eye and shoved her genitals into Ms. Semelbauer's face.

210.     Finally, on November 7, 2012, Ms. Semelbauer was released due to overcrowding.

211.     Ms. Semelbauer is not the only inmate that MCJ has held past her release date in recent years.  In a similar incident in 2011, an inmate was held three days beyond her sentence.

**J.     Construction of New Jail**

212.     After years of housing inmates in intolerable conditions, Muskegon County recently began construction of a new jail facility to replace the existing facility.

213.     Inmates will continue to be housed in the existing facility until construction of the new facility is completed.

214.    It was recently reported that the new jail is scheduled to be completed in June 2015, although the completion date has been pushed back several times.

215.    In bringing this action, plaintiffs seek to ensure that the new jail is constructed in a manner that remedies the constitutional violations outlined above.  For example, plaintiffs seek to ensure that toilet and shower facilities are designed to provide privacy from cross-gender viewing.

216.    Plaintiffs also seek to ensure that current and future inmates can obtain interim injunctive relief from unconstitutional conditions of confinement until such time as the new jail is completed.

217.    For issues which are not directly related to facility design, the transition to the new jail provides an opportunity to ensure that defendants satisfy their constitutional obligations to plaintiffs and the class members they seek to represent.

## CLASS ACTION ALLEGATIONS

218.    Plaintiffs seek to represent four overlapping classes as follows:

    a.    Class I, or the "Female Damages Class," is a class of former female inmates seeking damages for harms specific to female inmates under Counts I through III of this Complaint.

    b.    Class II, or the "Overcrowding Damages Class," is a class of former male and female inmates seeking damages for overcrowding and other abysmal conditions of confinement under Count IV of this Complaint.

    c.    Class III, or the "Female Injunctive Class," is a class of current and future female inmates seeking declaratory and injunctive relief from ongoing

harms specific to female inmates under Counts I through III of this

Complaint.

   d.    Class IV, or the "Overcrowding Injunctive Class," is a class of current and

future male and female inmates seeking declaration and injunctive relief

from overcrowding and other abysmal conditions under Count IV of this

Complaint.

219.    For each of the four classes identified above:

   a.    the class is so numerous that joinder of all members is impracticable;

   b.    there are questions of law or fact common to the class;

   c.    the claims of the plaintiffs seeking to represent the class are typical of the

claims of the class; and

   d.    the plaintiffs seeking to represent the class will fairly and adequately

protect the interests of the class.

220.    For Classes I and II (together, the "Damages Classes"), the common questions predominate over questions affecting only individual class members, and a class action is superior to other methods for adjudicating the class members' claims.

221.    For Classes III and IV (together, the "Injunctive Classes"), the municipal defendants have acted or refused to act on grounds that apply generally to the class, so that declaratory and injunctive relief is appropriate respecting the class as a whole.

**Class I: Former Female Inmates
("Female Damages Class")**

222.    Plaintiffs Semelbauer, Bosch, Vos, Brown, Baker, Speers, and Kitchens bring this action for damages on their own behalf, and pursuant to Fed. R. Civ. P. 23(a) and Fed. R. Civ. P. 23(b)(3), on behalf of all others similarly situated.

29

223.     These plaintiffs seek to represent a class ("Class I" or the "Female Damages Class") consisting of all former female inmates who were incarcerated at the MCJ at any time within three years prior to the filing of this litigation.

224.     All members of Class I were harmed by the municipal defendants' policy, custom or practice of (a) regularly and routinely subjecting female inmates to viewing by male guards while the inmates are toileting, showering, or changing clothes; (b) denying female inmates exercise time outside of their cells; and (c) denying class members adequate access to feminine hygiene products, toilet paper, and undergarments and other clothing.  These allegations encompass Counts I through III of this Complaint.

225.     There are questions of law and fact common to the class, namely whether defendants engaged in the challenged policies/customs/practices, and whether those policies/customs/practices violated class members' rights under the Fourth Amendment, Eighth Amendment, and Due Process Clause of the Fourteenth Amendment to the United States Constitution.

226.     The proposed class representatives' claims are typical of the claims of Class I because all women inmates were subjected to the same unconstitutional conditions at the MCJ as challenged in Counts I through III of this Complaint.

**Class II: Former Inmates**
**("Overcrowding Damages Class")**

227.     Plaintiffs Semelbauer, Bosch, Vos, Brown, Baker, Speers, and Kitchens bring this action for damages on their own behalf, and pursuant to Fed. R. Civ. P. 23(a) and Fed. R. Civ. P. 23(b)(3), on behalf of all others similarly situated.

228.     These plaintiffs seek to represent a class ("Class II" or the "Overcrowding Damages Class") consisting of all former inmates who were incarcerated at the MCJ at any time within three years prior to the filing of this litigation.

229.     All members of Class II were harmed by the municipal defendants' policy, custom or practice of failing to remedy the severe overcrowding and other abysmal conditions at the MCJ.  These allegations encompass Count IV of this Complaint.

230.     There are questions of law and fact common to the class, namely whether defendants engaged in the challenged policies/customs/practices, and whether those policies/customs/practices violated class members' rights under the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

231.     The proposed class representatives' claims are typical of the claims of Class II because all inmates were subjected to the same unconstitutional conditions at the MCJ as challenged in Count IV of this Complaint.

### Class III: Current and Future Female Inmates
### ("Female Injunctive Class")

232.     Plaintiffs Collins, Dorn, Pauley, and Wickliffe bring this action for declaratory and injunctive relief on their own behalf, and pursuant to Fed. R. Civ. P. 23(a) and Fed. R. Civ. P. 23(b)(2), on behalf of all others similarly situated.

233.     Plaintiffs Collins, Dorn, Pauley, and Wickliffe seek to represent a class ("Class III" or the "Female Injunctive Class") consisting of all current and future female inmates at the MCJ.

234.     All members of Class III are being harmed, or absent injunctive relief will be harmed, by the municipal defendants' policy, custom or practice of (a) regularly and routinely subjecting class members to viewing by male guards while the inmates are toileting, showering,

or changing clothes; (b) denying class members exercise time outside of their cells; and (c) denying class members adequate access to feminine hygiene products, toilet paper, and undergarments and other clothing.  These allegations encompass Counts I through III of this Complaint.

235.    There are questions of law and fact common to the class, namely whether defendants engage in the challenged policies/customs/practices, and whether those policies/customs/practices violate class members' rights under the Fourth Amendment, Eighth Amendment, and Due Process Clause of the Fourteenth Amendment to the United States Constitution.

236.    The proposed class representatives' claims are typical of the claims of Class III because all women inmates are subjected to the same unconstitutional conditions at the MCJ as challenged in Counts I through III of this Complaint.

### Class IV: Current and Future Inmates ("Overcrowding Injunctive Class")

237.    Plaintiffs Collins, Dorn, Pauley, and Wickliffe bring this action for declaratory and injunctive relief on their own behalf, and pursuant to Fed. R. Civ. P. 23(a) and Fed. R. Civ. P. 23(b)(2), on behalf of all others similarly situated.

238.    Plaintiffs Collins, Dorn, Pauley, and Wickliffe seek to represent a class ("Class IV" or the "Overcrowding Injunctive Class") consisting of all current and future inmates at the MCJ.

239.    All members of Class IV are being harmed, or absent injunctive relief will be harmed, by the municipal defendants' policy, custom or practice of failing to remedy the severe overcrowding and other abysmal conditions at the MCJ.  These allegations encompass Counts IV of this Complaint.

240.    There are questions of law and fact common to the class, namely whether defendants engage in the challenged policies/customs/practices, and whether those policies/customs/practices violate class members' rights under the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

241.    The proposed class representatives' claims are typical of the claims of Class IV because all inmates are subjected to the same unconstitutional conditions at the MCJ as challenged in Count IV of this Complaint.

## MUNICIPAL LIABILITY

242.    The municipal defendants maintained and continue to maintain a custom, policy or practice of (a) regularly and routinely subjecting female inmates to viewing by male guards while showering, changing clothes or using the toilet; (b) denying female inmates access to out-of-cell exercise opportunities; (c) failing to provide adequate feminine hygiene products, toilet paper and undergarments and other clothing to female inmates; and (d) subjecting all inmates to severe overcrowding and other abysmal conditions of confinement.

243.    This custom, policy or practice is evidenced by (1) defendants' official policies and practices; (2) the actions and decisions of officials with final decision-making authority; (3) defendants' failure to adequately train and supervise MCJ staff; and (4) a custom of tolerating or acquiescing to repeated violations of the constitutional rights of MCJ inmates.

244.    Defendants have long had actual or constructive notice of the unconstitutional conditions at the MCJ.

245.    Nevertheless, defendants have failed to take action to remedy the unconstitutional conditions.

246.     Plaintiffs and other inmates have repeatedly submitted written grievances and kites and have repeatedly made verbal complaints regarding the challenged conditions.

247.     The Michigan Department of Corrections' inspection reports have identified serious deficiencies at the MCJ.

248.     On August 8, 2013, plaintiffs' counsel wrote to defendants' counsel outlining the problems at the jail, and seeking to resolve the matter short of litigation.

249.     After meeting with MCJ officials and their counsel, plaintiffs' counsel commissioned an expert report from Peter Wilson, a corrections consultant and expert.

250.     Mr. Wilson's report and recommendations, which were based on an August 15, 2013 tour of the facility and review of numerous MCJ records, was provided to the MCJ on January 9, 2014.

251.     Key findings of the expert report were that (a) the MCJ is chronically overpopulated and that the MCJ and Muskegon Circuit Court have failed to execute a population control plan; (b) the safety, security and sanitary conditions at the MCJ are below constitutional standards; (c) the MCJ is in a general state of disrepair; (d) female inmates are required to expose their breasts and genitals to male guards while showering or use the toilet; (d) medical assessments are not provided in a timely fashion; and (e) exercise opportunities for inmates are inadequate or entirely lacking.

252.     In a March 22, 2014 letter, defendants' counsel responded to the expert report by asserting either that the problems did not exist, had been addressed, or were not defendants' responsibility.

253.     In fact, the experiences of current inmates such as Ms. Dorn, Ms. Pauley and Ms. Wickliffe, as well as other recent inmates such as Ms. Collins, Ms. Brown, Ms. Baker, Ms.

Speers and Ms. Kitchens, reveal that that conditions raised in the August 8, 2013 letter and January 9, 2014 expert report have remained essentially unchanged.

254.    Defendants have failed to meet their duty to adequately train and supervise MCJ staff in order to ensure that those staff act in accordance with well-established constitutional principles.

255.    Defendants have also failed to meet their duty to appropriately discipline their staff for legitimate grievances filed by inmates.

256.    This failure to train, supervise and discipline has had, and continues to have, the highly predictable consequence of allowing staff to overpopulate the holding tanks, ignore requests to fix basic plumbing and maintenance problems, ignore requests to provide sanitary items, verbally degrade female inmates and engage in the other unconstitutional action or inaction outlined above.  It has also led to at least two instances of inmates being incarcerated beyond their proper release dates.

257.    Defendants have failed to adequately train, supervise, and discipline MCJ staff despite the fact that the defendants had actual or constructive notice of the challenged conditions. The failure to train, supervise and discipline under these circumstances constitutes deliberate indifference to the rights of plaintiffs.

258.    Despite a clear and persistent pattern of constitutional rights violations, and despite the fact that defendants had actual or constructive notice of this clear and persistent pattern, defendants either explicitly or tacitly approved of this unconstitutional conduct, such that their failure to act constitutes deliberate indifference to the rights of plaintiffs.

259.    The custom, policy and practice of Defendants—including official policies, the actions of officials with final decision-making authority, the failure to adequately train,

supervise, and discipline MCJ staff for the challenged conduct, and the tolerance of repeated violations of individuals' constitutional rights—are the moving force behind and the proximate cause of the challenged conduct.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF PRIVACY AND BODILY INTEGRITY

260.    Jail inmates retain a constitutional right to bodily privacy during their incarceration.

261.    Due to defendants' policy, practice or custom, plaintiffs and class members have been, are being, and will be subjected, without any penological justification or other legitimate purpose, to routine and systematic viewing by members of the opposite sex while naked and partially naked, while showering, while toileting, and while attending to their menstrual periods.

262.    Due to defendants' policy, practice or custom, plaintiffs and class members have been, are being, and will be subjected to discipline, punishment and threats of discipline and punishment for trying to use reasonable means to protect their privacy and bodily integrity while they shower, dress, and use toilets at the MCJ.

263.    With respect to convicted inmates incarcerated at the MCJ, the routine viewing by male guards and male trustees constitutes unnecessary and wanton infliction of pain and are maintained with deliberate indifference to Plaintiffs' Eighth Amendment rights.

264.    With respect to pretrial detainees incarcerated at the MCJ, the routine viewing by male guards and male trustees has caused such detainees who have not yet been convicted of any crime to suffer punishment without due process of law.

265.    Routine viewing by male guards and trustees also constitutes an unjustified invasion of privacy and bodily integrity in violation of the Fourth Amendment to the United States Constitution.

266.    Defendants, acting under color of state law, violated and are violating the prohibition against unreasonable searches and seizures under the Fourth Amendment to the United States Constitution; the prohibition against cruel and unusual punishment under the Eighth Amendment to the United States Constitution; and the prohibition against punishment of pretrial detainees under the Due Process Clause of the Fourteenth Amendment by permitting male guards and male trustees to regularly, routinely and without penological justification view plaintiffs and class members while they shower, dress and use toilets at the MCJ, and by punishing or threatening to punish plaintiffs and class members when they try to protect their privacy.

267.    Persons violating the Fourth, Eighth, or Fourteenth Amendments to the United States Constitution under color of state law are liable at law and in equity under 42 U.S.C. § 1983.

268.    Under Count I, the Female Damages Class seeks damages against the municipal defendants; the Female Injunctive Class seeks declaratory and injunctive relief against the municipal defendants; all plaintiffs individually seek damages against the municipal defendants and unknown correctional officers; plaintiffs Collins, Dorn, Pauley, and Wickliffe seek declaratory and injunctive relief against the municipal defendants; plaintiff Vos seeks damages against defendant Gutowski; and plaintiff Collins seeks damages against defendant DeYoung.

## COUNT II
## DENIAL OF EXERCISE

269.    Due to defendants' policy, practice or custom, plaintiffs and class members have been, are being, and will be denied out-of-cell exercise.

270.    With respect to convicted inmates incarcerated at the MCJ, the denial of exercise constitutes unnecessary and wanton infliction of pain evidencing deliberate indifference to plaintiffs' Eighth Amendment rights.  The denial of exercise is not justified by any legitimate penological interest.

271.    With respect to pretrial detainees incarcerated at the MCJ, the denial of exercise constitutes punishment without due process of law.

272.    By denying, as a rule, out-of-cell exercise to female inmates at the MCJ, defendants have violated and are violating the prohibition against cruel and unusual punishment under the Eighth Amendment and the prohibition against punishment of pre-trial detainees under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

273.    Persons violating the Eighth or Fourteenth Amendment to the United States Constitution under color of state law are liable at law and in equity under 42 U.S.C. § 1983.

274.    Under Count II, the Female Damages Class seeks damages against the municipal defendants; the Female Injunctive Class seeks declaratory and injunctive relief against the municipal defendants; all plaintiffs individually seek damages against the municipal defendants and unknown correctional officers; and plaintiffs Collins, Dorn, Pauley, and Wickliffe seek declaratory and injunctive relief against the municipal defendants.

## COUNT III
### DENIAL OF ACCESS TO FEMININE HYGIENE PRODUCTS, TOILET PAPER, AND ADEQUATE UNDERWEAR AND OTHER CLOTHING

275.     Due to defendants' policy, practice or custom, plaintiffs and class members have been, are being, and will be denied feminine hygiene products, toilet paper, and adequate underwear and other clothing.

276.      By denying these items to female inmates at the MCJ, defendants have violated and are violating the prohibition against cruel and unusual punishment under the Eighth Amendment and the prohibition against punishment of pre-trial detainees under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

277.     Persons violating the Eighth or Fourteenth Amendment to the United States Constitution under color of state law are liable at law and in equity under 42 U.S.C. § 1983.

278.     Under Count III, the Female Damages Class seeks damages against the municipal defendants; the Female Injunctive Class seeks declaratory and injunctive relief against the municipal defendants; all plaintiffs individually seek damages against the municipal defendants and unknown correctional officers; plaintiffs Collins, Dorn, Pauley, and Wickliffe seek declaratory and injunctive relief against the municipal defendants; plaintiff Kitchens seeks damages against defendant Grieves; and plaintiff Collins seeks damages against defendant Morris.

## COUNT IV
### SEVERE OVERCROWDING AND OTHER ABYSMAL CONDITIONS

279.     Due to defendants' policy, practice or custom, plaintiffs and class members have been, are being, and will be subjected, without any penological justification or other legitimate purpose, to severe overcrowding and other inadequate, unsanitary and dangerous conditions, and prolonged stays in the holding tank, as alleged above.

280.    With respect to convicted inmates incarcerated at the MCJ, the conditions maintained by defendants constitute unnecessary and wanton infliction of pain and are maintained with deliberate indifference to plaintiffs' Eighth Amendment rights.  The conditions are not justified by any legitimate penological interest.

281.    With respect to pretrial detainees incarcerated at the MCJ, the conditions maintained by the defendants have caused such detainees to suffer punishment without due process of law.

282.    Defendants, through their policy, practice or custom of permitting such overcrowding and such abysmal conditions, have violated and are violating the prohibition against cruel and unusual punishment under the Eighth Amendment and the prohibition against punishment of pretrial detainees under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

283.    Persons violating the Eighth or Fourteenth Amendment to the United States Constitution under color of state law are liable at law and in equity under 42 U.S.C. § 1983.

284.    Under Count IV, the Overcrowding Damages Class seeks damages against the municipal defendants; the Overcrowding Injunctive Class seeks declaratory and injunctive relief against the municipal defendants; all plaintiffs individually seek damages against the municipal defendants and unknown correctional officers; and plaintiffs Collins, Dorn, Pauley, and Wickliffe seek declaratory and injunctive relief against the municipal defendants.

**COUNT V**
**Michelle Semelbauer Only**

285.    Defendants' policy, practice, and custom, as well as the individual actions of the named and unnamed correctional officers, caused plaintiff Michelle Semelbauer to be unlawfully held in the MCJ for 28 days.

286.     The Fourth, Eighth and Fourteenth Amendments to the U.S. Constitution prohibit the continued incarceration of an inmate beyond her legal sentence.

287.     Persons violating the Fourth, Eighth or Fourteenth Amendment to the United States Constitution under color of state law are liable at law and in equity under 42 U.S.C. § 1983.

288.     Under Count V, plaintiff Semelbauer seeks damages against the municipal defendants and defendants Morris and Gutowski.

### REQUEST FOR RELIEF

Based on the foregoing, plaintiffs request that the Court provide relief as follows:

1.     Certify a Female Damages Class, an Overcrowding Damages Class, a Female Injunctive Class, and an Overcrowding Damages Class, as those classes have been defined above;

2.     Declare that defendants are violating or have violated the constitutional rights of plaintiffs and the classes they represent by:

     a.     permitting male guards to regularly, routinely and without penological justification view plaintiffs and class members while they shower, dress, and use the toilets at the MCJ, and punishing or threatening to punish plaintiffs and class members when they try to protect their privacy;

     b.     denying plaintiffs and class members adequate out-of-cell exercise;

     c.     denying plaintiffs and class members adequate feminine hygiene products, toilet paper, and underwear and other clothing;

     d.     permitting severe overcrowding; and

     e.     maintaining otherwise abysmal conditions as outlined above;

3.      Enjoin defendants from:

      a.      permitting male guards to regularly, routinely and without penological justification view plaintiffs Dorn, Pauley, and Wickliffe and the class members they represent while they shower, dress, and use the toilets at the MCJ, and punishing or threatening to punish Dorn, Pauley, and Wickliffe and other class members when they try to protect their privacy;

      b.      denying Dorn, Pauley, and Wickliffe and the class members they represent adequate out-of-cell exercise;

      c.      denying Dorn, Pauley, and Wickliffe and the class members they represent adequate feminine hygiene products, toilet paper, and underwear and other clothing;

      d.      continuing to permit severe overcrowding; and

      e.      continuing to maintain otherwise abysmal conditions as outlined above;

4.      Award damages to all plaintiffs and members of the Damages Classes for the constitutional violations set forth in Counts I through V of this Complaint;

5.      Award plaintiffs reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and

6.      Grant any other relief the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all those issues so triable as of right.

Respectfully submitted,

By:    /s/ Miriam J. Aukerman

AMERICAN CIVIL LIBERTIES UNION
    FUND OF MICHIGAN
Miriam J. Aukerman (P63165)
Marc S. Allen (NY 5230008)
1514 Wealthy Street SE, Suite 242
Grand Rapids, MI 49506
(616) 301-0930
maukerman@aclumich.org
mallen@aclumich.org

Daniel S. Korobkin (P72842)
Michael J. Steinberg (P43085)
Kary L. Moss (P49759)
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6800
snelson@aclumich.org
dkorobkin@aclumich.org
msteinberg@aclumich.org

Dated: February 6, 2015

PITT, MCGEHEE, PALMER& RIVERS, P.C.
Michael L. Pitt (P24429)
Beth M. Rivers (P33614)
Kevin M. Carlson (P67704)
Andrea J. Johnson (P74596)
Cooperating Attorneys, American Civil
    Liberties Union Fund of Michigan
117 West Fourth Street, Suite 200
Royal Oak, MI 48067
(248) 398-9800
mpitt@pittlawpc.com
brivers@pittlawpc.com
kcarlson@pittlawpc.com
ajohnson@pittlawpc.com

**Certificate of Service**

I certify that on February 6, 2015 I filed the foregoing paper with the Clerk of Court using the

ECF system which will send notice to all counsel of record.


By:     /s/ Miriam J. Aukerman_____
        Miriam J. Aukerman (P63165)